NORTHERN PACIFIC RAILWAY COMPANY v. MINNESOTA TRANSFER RAILWAY COMPANY.[1]

December 22, 1944.

No. 33,791.

[1]Reported in 16 N. W. (2d) 894.

*A. C. Erdall,* for appellant.

*L. B. daPonte* and *D. R. Frost,* for respondent.

LORING, CHIEF JUSTICE.

This is an appeal from an order denying a motion for new trial on the ground that certain findings of fact and conclusions of law were not justified by the record.

The first question presented for decision is whether defendant, be it connecting carrier or agent, either with or without compensation, is liable to indemnify plaintiff, either as initial carrier or principal, for payments made to a shipper, because of the negligence of defendant in handling cattle routed over its railroad and stockyards, where the loss occurred.

The second question is whether defendant was guilty of negligence in handling cattle in its stockyards which resulted proximately in damage to them.

The action arose out of the shipment to himself at Minnesota Lake, Minnesota, of nine carloads of cattle by Henry Stokman from Colstrip, Montana, a station on the plaintiff railroad. The cars were routed by the Northern Pacific railway, the Minnesota Transfer railway, and the Milwaukee railroad. The cattle were unloaded, fed, and watered at Jamestown, North Dakota, and were there reloaded on the morning of October 17, 1940. They arrived at the Prior avenue stockyards of the Minnesota Transfer railway at 12:30 a. m., October 18. On account of the train service on the Milwaukee to Minnesota Lake, that railroad requested that the cattle be unloaded by defendant for feed, water, and rest in order not to violate the law limiting the time during which they might be kept in the cars. They were to be reloaded in time for the Milwaukee freight train, which left for Minnesota Lake the evening of the 18th.

The defendant's stockyards were so arranged that the loading track, which ran north and south, lay along a platform from which runways extended east between feeding pens arranged in a double tier, contiguous with the platform. Immediately east of the pens

was a long alley from 12 to 16 feet wide which extended parallel to the platform the full length of the row of pens. The first pen on the north end of the row was a testing pen, apparently not designed for ordinary feeding purposes, and the runway between it and pens Nos. 2 and 3 led from the platform directly to the alley with no opening into those pens.

The pens were numbered and, with the exception of the No. 1 pen, arranged in pairs, with the even numbers next to the platform and the odd numbers next to the alley. For convenience, we shall refer to the runways as bearing the number of the even-numbered pen immediately to the north of each. Pens No. 2 and No. 3 lay immediately south of No. 1 runway but did not open into it, but into runway No. 2.

The yards were built to accommodate 36-foot cars, which could be spotted continuously on the platform opposite these numerous runways; but the Northern Pacific cars involved in the shipment here under consideration were 40-foot cars, and consequently but two of them could be spotted opposite adjacent runways. Then, a space had to be left and a runway skipped, and the next pair of 40-foot cars could be spotted at the next two runways, and so on down the platform. This reduced the number of cars that might be spotted to the runways and may account for the use by defendant of the runway to which the car here involved was spotted as hereinafter noted.

On the night in question, before defendant undertook to unload the car here involved, it had placed upon its unloading track a string of cars that extended to the south, beyond the end of the platform and pens. For its own convenience, it spotted the car of cattle here involved opposite runway No. 1, although it planned to place these cattle in pen No. 2, which opened upon runway No. 2. This necessitated routing the cattle through runway No. 1 into the alley and back through runway No. 2 to pen No. 2, which was next to the platform.

There were gates across the main alley at most, but not all, of the runways. According to the plat introduced by defendant, there

was a gate at pen No. 3, but had it been closed it would have cut off access to pen No. 2, where defendant proposed to feed and water these cattle. There was no gate opposite pen No. 5, but there was one opposite pen No. 7, which, for convenience, we shall call gate No. 7. This was closed, but the evidence tends to show that its fastening was defective. It was so placed, when it was closed, as to create a cul-de-sac for cattle going south between pen No. 7 and the east side of the alley. There was also an obstruction which narrowed the alley to ten-feet-six, opposite pen No. 5 and runway No. 4.

When the car doors were opened, the cattle rushed through the chute across the platform to the runway, through the runway to the alley, and there turned to the south. Part of them, instead of turning to the right up the runway to pen No. 2 or up the next runway toward pen No. 4, went straight ahead into the cul-de-sac, and, with the momentum acquired in their rush along the alley, crashed the gate with the defective fastening at No. 7 and dashed down the alley to the runway on the south side of pens Nos. 22 and 23, where a gate across the alley turned them into that runway. By this time, they were going at such speed that defendant's foreman described it as a stampede. They broke down the small gate at the platform end of runway No. 22 and were at large until seven were killed by police. Two more were injured at the platform.

The Northern Pacific paid the shipper $960 for the loss and injury to the cattle and now seeks to recover that sum and interest from the defendant on the theory that the loss was due to its negligence. The trial court found that defendant was negligent and ordered judgment for plaintiff in the sum of $960 and interest. Defendant moved for amended findings and conclusions or a new trial. The motion was denied.

Plaintiff sued upon the theory that defendant was a connecting carrier, not an agent. In the view we take of the defense, it becomes unnecessary to determine whether plaintiff's theory is correct.

The contentions of defendant are that it was the gratuitous agent of plaintiff and not liable to the plaintiff for negligence, that its method of handling the cattle and the defects in the fastening of gate No. 7 were not the proximate cause of the loss and damage to the cattle.

■ Defendant cites the general rule that an agent who acts within the scope of his authority for a known principal is not personally liable on a contract made for that principal. Such is not the problem presented here. Here, we have the question whether the agent, if it be such, is liable to the principal for the agent's fault, which has given rise to a liability of the principal to a third person.

The general rule appears to be that an agent owes to his principal the use of such skill as may be required to accomplish the object of his employment; if he omits to exercise reasonable care, diligence, and judgment, and, as a result, his principal has to respond to a third party in damages, he may be held responsible to the principal for the loss. The fact that the agent acts gratuitously does not relieve him of liability for wrongful acts or negligence, where, as here, the agent accepts employment in a capacity that implies the possession of competent skill. 1 Mechem, Agency (2 ed.) §§ 1281, 1282, 1283; Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, 23 L. R. A. 90, 38 A. S. R. 766; Meyerson v. New Idea Hosiery Co. 217 Ala. 153, 115 So. 94, 55 A. L. R. 1231. Therefore, even if we were to assume the correctness of defendant's premises, we could not arrive at its conclusions. We must hold that it would be liable to its principal for its negligence, resulting in the liability of its principal. The case at bar is clearly distinguishable from In re Solliday v. St. Paul Union Depot Co. 178 Minn. 219, 226 N. W. 572. In that case the contract between the depot company and the railroads controlled reimbursement for injuries to persons using the station, whereas here there is no contract covering reimbursement, but only a by-law of defendant assuming to create the relation of principal and agent between the railroads and defendant.

■ We come, then, to the assertion that defendant's negligence was not the proximate cause of the loss. With this contention we cannot agree. Defendant had handled western range cattle for years and may be conclusively presumed to have known their propensities. The line of the Northern Pacific railway comes through range country in Montana. Cattle from the open western range that run at large the year around have propensities which are the normal result of freedom from restraint. They are not so tractable as those that feed in pastures and are accustomed to human control and feeding. They are more easily alarmed and excited. The fact that these cattle were billed from a point on the range was sufficient notice to defendant that they were not gentle cattle. They were being unloaded at night by electric light under conditions and in surroundings strange to range cattle and calculated to excite them.

Just how defendant expected these cattle to find their way to pen No. 2 is difficult to see. It so arranged its equipment for the unloading of this car that the cattle might rush down runway No. 1, past runways No. 2 and No. 4, and along the alley into the cul-de-sac, which was equipped with a defective gate. Having burst through the gate, the excitement of crashing it tended to accelerate their rush for the open, and so the small gate, which they broke through onto the platform at runway No. 22, could offer only an apparent, rather than a real, obstacle to their progress.

There is abundant evidence to support the finding implicit in the trial court's order that defendant failed to exercise ordinary care in maintaining its equipment and in handling these cattle and that their injury and death followed naturally and proximately in unbroken sequence from such negligence.

Order affirmed.